And the court will proceed to the third case of the day, Tetzlaff v. Educational Credit Management. Tetzlaff v. Educational Credit Management Good morning. My name is Mark Tetzlaff, and I am the appellant pro se in this case. May it please the court. Just as a preliminary matter, I'd like to thank the court for allowing me to appear today. I realize that the court rarely grants pro se litigants oral argument, so in keeping with that privilege, I'll try to avoid redundancy where possible and confine my discussion to two main issues, which are whether the appellant satisfied the requirements of both the additional circumstances and good faith prongs of the three-part Brunner test under 11 U.S.C. section 523A. With regard to good faith, all I simply want to say is that, as previously argued, neither a debtor's mindset nor intent is required in order to satisfy the good faith requirement, like what the trial court found holding that one's state of mind can negate a finding of good faith. Good faith only requires that a debtor perform certain acts, as case law has sufficiently defined as a matter of law. Within the addendums, C through E, that were accepted by the trial court, there's more than enough evidence to substantiate a sufficient amount of acts to satisfy the good faith prong. Good faith based on the fact that you paid some of the private debt? There's a couple of other issues, Your Honor. There was a motion I filed with the trial court using the argument that the student account that I had, which in my last law school that I attended, which was Florida Coastal, I had built up a substantial amount of owed tuition to them because at the time my student loan amounts had reached their limits. So they essentially gave me credit for the rest of that, and through that period since I was working and had money saved and was withdrawing money from that, I was paying that tuition all the way along because if I hadn't done that, they would not have continued to extend credit in order for me to finish the degree. So what you were doing, you had accumulated already, whatever, $250,000 in student loans? Something like that. Well, at present it's about $271,000. It's accumulated. Whatever it is, when you were at the law school, where did you go? Florida Coastal School of Law. Florida Coastal. You were in DePaul first, right? Yes, I was. You spent one year there or something? I was actually let go with nine credits left in an 86-credit program because I had fallen short on what they called their per-semester GPA. Did you get credit for that when you went to the other school? They gave me 18 credits towards the next 90 credits, yes. 18 instead of 80? The ABA allows up to 30 credits to transfer and they only, for whatever reason, just gave me 18. The good faith that you're arguing is that you were at least paying Coastal. Otherwise, they're not going to let you stay there, are you? What I argued in that motion is that the payments that were made qualified as student loans and that the trial court should have reviewed that matter in lieu of the facts that I presented with regard to that, and the court, of course, denied that motion. I was simply trying to establish that if those loans are, or if the amounts that were paid on that student account are student loans, that being the greatest weighted factor under the good faith analysis prong, one could then say that I did make payments towards student loans. So that's what that motion was originally put forward on. So with regard to additional circumstances, the appellant argues that before the court can reach a decision on that question, it must first address an important threshold issue, namely whether certainty of hopelessness still applies after the decision it reached in Krieger. At present, certainty is required in this circuit under matter of Roberson and reaffirmed in Golay. Specifically, the appellant contends that certainty effectively raises a standard of proof from one of preponderance to something higher than preponderance. As such, the certainty requirement directly conflicts with the U.S. Supreme Court's decision in Grogan v. Garner, which held that a preponderance of evidence standard applies to all exceptions from dischargeability of debts under 11 U.S.C. Section 523A. Another issue I raised is whether something less than certainty is required, which was articulated by another line of cases in this circuit, namely In re. Hoskins, Clark, and Nelson, under what appellant titles the Hoskins Standard. Like certainty, the appellant contended that this standard also conflicts with Grogan since it also propounds a higher than preponderance standard. At trial, the court denied appellant's motion to set aside certainty, unlike Judge Martin, who did so in In re. Meyer following Krieger. In dicta, the trial court also reviewed the matter under the Hoskins Standard and also determined that appellant had not proved additional circumstances. The district court affirmed. Therefore, this court should clarify whether certainty still applies after Krieger but also address the intra-circuit legal conflict about whether certainty or something less than certainty is required as well, vis-à-vis the Hoskins requirement. One thing with Krieger is the reason the court really reversed the district court was because of the findings of the bankruptcy. And the bankruptcy court's findings were in favor of the debt. And it was given, obviously, an exception to achieve it. I don't know. He said something like 200 applications and all kinds of other things. A lot of effort in the court. There's a story. You know, I actually had a concern with him. He was concerned about the whole system of receiving loans. But he convinced the bankruptcy court, based on credibility of settlement, that he really would have been able to get in. And he didn't manage to do that. And so we're looking at the credibility findings of the bankruptcy court. Correct. And it was in the district court. There are a couple arguments that I had offered with regard to satisfying that requirement. The one I really rest on comes out of Krieger, where in my situation, if you look at the exhibit that both I and the appellee filed, which is a whole record of my Social Security report, and the court accepted that, you'll see that at least over the last past ten years, with regard to the agencies that I kind of faced and the personal circumstances that I faced, that I was unable to even earn more than the federal poverty level for any one of those years, with the exception of one. And so, in my view, that's some of the best evidence to show whether or not there's a chance more likely than not that I would ever be able to repay the student loans. And this was also the same finding that I found in Krieger, because it was largely her inability to earn and having not been able to work herself for a good period of time that mattered. So, on that basis, I'm saying that my circumstances resemble Krieger and, therefore, should receive the same result that Krieger did. It's obvious that the debt that you've run up is substantial. The question to me is, how are you even able to do that? You haven't even been able to know. That's one of the things that concerns me about this case. It's kind of refreshing that you get off the hook for having what I would have to say was pretty risky borrowing a huge amount of money to finish up your degree. I don't know why you didn't succeed. That's what I'm concerned about, the whole impact of that, because there's over a trillion now of outstanding student loans. Well, to answer that question, I certainly wanted to get the degree finished. They did offer me some partial scholarship in coming there. Certainly, when you start something like that, you certainly want to finish it. In the instance that I ran this up, the problem is in the student loan program, there's no requirement today, unlike when Bruner came in in 1987. There is absolutely no requirement on what one can borrow. In other words, you don't have to demonstrate financial need, unlike 1987 when you did. Similarly, and probably most important, you had to secure the loans back then, prior to 1992, meaning you needed a cosigner. I'm very frustrated that you could go and borrow that much money without any security or anything else. It's obviously, does the government underwrite these things? That's a very good question, because what I was going to do is cover that very briefly, because here's where the problem comes in. Again, the student loan, in 1992, the Higher Education Act was amended by Congress to remove both the limit on what you could borrow. They liberalized it, so it went from, on an undergraduate basis, from $7,600 to threefold. On the graduate basis, it went from $21,000 to $138,000. This all occurred in 1992. But the most important thing to answer your question, Your Honor, is that they removed the security and collateral requirement, which then allowed students to go ahead and borrow as much as they could. That's what's occurred. And, of course, since then, we've seen nothing but a skyrocketing of both undergraduate enrollment as well as graduate enrollment. Well, that's the problem. And you're a smart guy. You've had several other businesses. You've got an MBA from Marquette. You've got lots of success, at least in education, and a huge success in borrowing way too much money. Why not? Everybody else has run up a lot of bills. You're looking at this Krieger, and a lot of people are saying this is a great opening for getting bankruptcy courts to start discharging. Well, my only concern on the legal issue is simply to remove the certainty requirement. I'm not asking that we permanently garage-bruner, as Judge Pappas has argued in the N. Ray Roth case, which is a 2003 BAP case out of the Ninth Circuit, where he's already advocating that the bruner test itself is outdated simply because the circumstances out of which it arose no longer apply. And so rather than go to a totality test, which is what he's advocating that court does, I'm simply saying let's open this up a little bit more so we can bring the meaning of what getting a fresh start is versus the presumption that everybody has to face in discharging loans, which is against discharge. You have two separate lines of jurisprudence, one that wants to liberate, the other wants to constrain. And my view is that if we just eliminate this little piece, it at least gives some people more opportunity, those that are deserving, to discharge their loans. This isn't even going to be impartial. We can't segment this. It's all, whatever you say, what is it up to, $275,000? And the only reason that that occurred, as I said, Your Honor, if you read the last ten years I've simply had to deal with a father who I had helped caretake during that time, and certainly during that time I simply couldn't work. I'm the only sibling left. And I worked what I could. I took whatever I could during that period. It was only supposed to be about three years before he would be fully convalesced, and it ended up to be nine. Now with all of your talent, your education, you really don't want to get a good job because you're going to have to pay it all off. You'd rather just start cleaning than make money. At this juncture, as I say, when you discount the fact of these misdemeanors, the biggest one being the intimidate victim, dissuade reporting one, that has absolutely curtailed my ability to find any kind of employment simply because a layperson looking at that without knowing the law sees violence. And I can't even get a job at a grocery store as a result of that. So I have to go on at this point trying to seek employment of any kind, and in this regard I don't even know what that might be. And at this point I'm unemployable, so I have to still find something to do. And based on that speculative notion, I'm not sure that the court could conclude that it would be more reasonable than not that I'd likely repay the student loans. And that's, I guess, where I would conclude. Your Honor, thank you. Ms. Pretner? Good morning, Your Honors. May it please the Court, my name is Kelly Pretner and I represent the Appley Educational Credit Management Corporation. It is our position that the judgment of the bankruptcy court should be affirmed because Mr. Tetzlaff did not prove that repayment would be an undue hardship under 11 U.S.C. Section 523A8. I'd like to take an opportunity to address some of the points raised by Mr. Tetzlaff. First of all, he mentioned that financial need was a requirement to obtain student loans back in 1987, and that is not true. There were student loans that were available without any type of securitization or anything like that. The government is not a guarantee of employability post-graduation. Once you attend school, you are taking the risk. By taking advantage of the deferred payment student loan funds, you are taking the risk that you may or may not find a job in the career that you are looking for or a job that would be able to allow you to repay the loans. That is a gamble. That is something, Judge, you mentioned Mr. Tetzlaff's borrowing history, and he did have a history of borrowing an amount of money well within the limits. That is true, but it was his decision to take on those obligations that require that he prove an undue hardship before he is able to discharge those debts. Who ends up paying? Why would the bank own this money? What is the incentive for them to disregard that there is no security other than the fact that it is not dischargeable? The government guarantees. The taxpayers then guarantee repayment, Your Honor. The bottom line is, whose money does he have borrowed in the first place? It wasn't borrowed from the government, was it? They were Mr. Tetzlaff's loans. I'm sorry, Your Honor. Financial institutions or some other source of the money that is underwritten by the government, or is this a direct loan from the government? The loans that Mr. Tetzlaff has are loans from the Federal Family Education Loan Program that were guaranteed student loans. So they were funded by a private bank, but then guaranteed by the government. The private bank is out the money right now. Is that accrued interest, or has the bank already been paid? By the filing of the bankruptcy, Your Honor, the guarantee agency, ECMC, was required to pay the claim and make the bank whole. So ECMC, as the guarantor, is currently the holder of the debt, and then ultimately the secretary and the education and the taxpayers. What's the consequence of his loans? The consequence, excuse me, Your Honor, can you repeat that? If it were discharged to the bank, what would be the consequence? The consequence, Your Honor, would be that that debt would not be paid, and ECMC would be required to what's called subrogate the loan to the Department of Education, and then it will be written off. Does the Department of Education have some kind of a fund? I'm sorry, Your Honor. Does DOE have some kind of a fund that's already been appropriated in the case of this kind of a default? Your Honor, I'm sorry. I don't know the answer to that specific question. Well, there's over a trillion dollars in outstanding student debt. That is very concerning, Your Honor. I agree. I don't know what concerns you about why this shouldn't be discussed. Your Honor, because ultimately then the taxpayers have paid for Mr. Tetzlaff's education, and the taxpayers are not being repaid the money for the funds that were borrowed. What's the laws to ECMC? To ECMC? ECMC is required to reimburse the bank. So we filed, or excuse me, the bank would have filed a bankruptcy claim, and ECMC would have reimbursed and made the bank whole. Does ECMC basically incur administrative costs? Because eventually you're not out $270,000. No, Your Honor. There is a provision where, as the guarantee agency, does receive make-whole funds from the government, Your Honor, yes. Right. So what is your law? Well, ECMC is tasked with protecting the federal fiscal interest. And as the guarantee agency, the Department of Education has engaged the guarantee agencies to make sure that the standards are being protected. I guess just following up with Mr. Manson's inquiry, I'm trying to understand the eventual bottom line for your client. Let's say you are successful here. What follows? So affirming the decision of the bankruptcy court that the debt is non-dischargeable, Mr. Tetzlaff would be required to find a repayment plan that would allow him to repay the debt, or he would potentially risk defaulting on the obligation. Let's assume that likelihood may occur. The default, Your Honor? I just want to know what the likely scenario is for your client. If Mr. Tetzlaff defaults on his obligation, then collection efforts are escalated, including tax offset, administrative wage garnishment, and ECMC would make efforts to collect. You're required to do that before you seek DOE reimbursement. Is that correct? Correct. Correct, Your Honor. Thank you. Any further questions on that point? All right. Also, I would like to take this opportunity to remind the court that all debtors in bankruptcy are experiencing a financial hardship. Otherwise, they wouldn't be in bankruptcy. The test for student loan discharge is that that hardship must be undue. That was Congress's attempt, or excuse me, that was Congress's recognition of the fact that there is no underwriting component that the government can undertake to ensure the creditworthiness of student borrowers. And to Mr. Tetzlaff's point about the certainty of hopelessness, certainty of hopelessness was used in the Roberson decision by this court when the Bruner test for undue hardship was adopted. And certainty of hopelessness is not a test by itself. It is merely a verbalism. It's a label that is used to differentiate between what's commonly referred to as garden variety financial hardship, that being the financial hardship that all bankruptcy debtors are experiencing, and undue hardship. So certainty of hopelessness was used just to distinguish between a present inability to fulfill a financial commitment and a hardship that was undue because it would be persisting throughout the repayment period. Well, it seems to me if these things weren't discharged, there would be a lot, a lot more responsibility taken before the ruling committee. This is just, and this is just maybe the resetting of the law. Someone thought that education should be the right for everybody to study, and now they can borrow on the side of the government. I agree, Your Honor, and there is a crisis at hand, but the proper response is through Congress and through the legislature, not through the courts. Was your organization recommended any changes in the law? Was that your job or is that something that someone else did?  That is not our job, and, in fact, in 2012, or excuse me, Your Honors, in 2010, the Federal Family Education Loan Program was eliminated, and all student loan lending now is direct lending. So guarantee agencies no longer play a role in the funding of educational loans. And then one last point, Your Honors, that I would like to make. The good faith component of the undue hardship test, the Krieger Court or the Krieger panel back in 2012 took the opportunity to clarify that the good faith question is a mixed question of law and fact, and it is thereby subject to the clearly erroneous standard of review. And Mr. Tetzlaff has not pointed to any errors made by the bankruptcy court. The determination that he had not undertaken good faith efforts to repay his loans was a factual determination subject to the clear error test, and credibility determinations were made by the bankruptcy judge that were supported by the record, and the judgment of the bankruptcy court should stand. Thank you, Your Honors. All right. Thank you, Mr. Pretner, and thank you, Mr. Tetzlaff. The Court will take the case under advisement, and we'll take a five-minute recess.